**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IN RE APPLICATION OF ORTHOGEN :
INTERNATIONAL GMBH, :
:    Case No. 23-mc-152
            Petitioner, :
:
for an order pursuant to 28 U.S.C. § 1782 to :
conduct discovery for use in a foreign :
proceeding. :
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# MEMORANDUM OF LAW IN SUPPORT OF *EX PARTE* APPLICATION FOR AN ORDER PURSUANT TO 28 U.S.C. § 1782 TO CONDUCT DISCOVERY FOR USE IN A FOREIGN PROCEEDING

MORVILLO ABRAMOWITZ GRAND
  IASON & ANELLO P.C.
Christopher B. Harwood
Joseph Stern
565 Fifth Avenue
New York, New York 10017
Tel: (212) 856-9600

*Attorneys for Petitioner Orthogen International GmbH*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ............................................................................................... iii

PRELIMINARY STATEMENT ......................................................................................... 1

BACKGROUND .............................................................................................................. 4

    A.   Mr. Capla Apparently Underreported Regenokine Treatments to Orthogen ............. 4

    B.   As a Result of the Apparently False Reports and Affidavits, Orthogen
         Appears to Have Been Defrauded Out of Many Millions of Dollars ......................... 6

    C.   Evidence From the SDNY Action Strongly Supports the Conclusion that
         Orthogen was Underpaid by Many Millions of Dollars ............................................ 8

         i.   NY Spine's Apparent Servicing of 3,500 Patients ......................................... 8

         ii.   Mr. Capla and Dr. Schottenstein's Alleged Receipt of $12 Million Per
             Year.................................................................................................................. 9

    D.   Orthogen Sent Demand Letters to Mr. Capla and Dr. Schottenstein.......................... 9

    E.   Orthogen Seeks Discovery for the Contemplated German Proceeding...................... 10

ARGUMENT .................................................................................................................... 13

    I.   THE PETITION SATISFIES THE STATUTORY REQUIREMENTS OF
        SECTION 1782 ........................................................................................................ 14

        A.   Dr. Schottenstein and NY Spine Reside and/or Are Found in this
            District ............................................................................................................ 14

        B.   The Discovery Sought Is for Use in a Proceeding Before a Foreign
            Tribunal........................................................................................................... 15

        C.   Orthogen is an "Interested Person" for Purposes of the Foreign
            Proceeding ...................................................................................................... 17

    II.   THE FOUR DISCRETIONARY FACTORS ALL WEIGH IN FAVOR OF
        GRANTING THE REQUESTED DISCOVERY ..................................................... 17

        A.   Orthogen Needs Section 1782 Discovery From Dr. Schottenstein and
            NY Spine ........................................................................................................ 18

        B.   A German Court Likely Would Be Receptive to the Requested
            Discovery ....................................................................................................... 20

C.   Petitioner Is Not Seeking to Circumvent German Proof-Gathering
Restrictions ........................................................................................ 21

D.   Orthogen's Discovery Requests Are Narrowly Tailored and Are Not
Unduly Intrusive or Burdensome.................................................................. 22

CONCLUSION............................................................................................................... 23

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Advanced Micro Devices, Inc. v. Intel Corp.*,
   292 F.3d 664 (9th Cir. 2002), *aff'd*, 542 U.S. 241 (2004) ............................... 17

*Application of Esses*,
   101 F.3d 873 (2d Cir. 1996)............................................................................. 17

*Burger King Corp. v. Rudzewicz*,
   471 U.S. 462 (1985) ......................................................................................... 14

*Certain Funds, Accounts &/or Inv. Vehicles v. KPMG, L.L.P.*,
   798 F.3d 113 (2d Cir. 2015)........................................................................ 14, 15

*Daimler AG v. Bauman*,
   571 U.S. 117 (2014) ......................................................................................... 15

*Euromepa, S.A. v. R. Esmerian, Inc.*,
   51 F.3d 1095 (2d Cir. 1995)............................................................................. 20

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
   564 U.S. 915 (2011) ......................................................................................... 14

*Gushlak v. Gushlak*,
   486 F. App'x 215 (2d Cir. 2012) ........................................................................ 1

*In re Accent Delight Int'l Ltd.*,
   869 F.3d 121 (2d Cir. 2017)............................................................................. 14

*In re Application of Auto-Guadeloupe Investissement S.A.*,
   2012 WL 4841945 (S.D.N.Y. Oct. 10, 2012) ............................................. 18, 19

*In re Application of Hill*,
   2007 WL 1226141 (S.D.N.Y. Apr. 23, 2007)................................................... 21

*In re Application of Johannes Roessner*,
   2021 WL 5042861 (S.D.N.Y. Oct. 29, 2021)................................................... 21

*In re Application of Mutabagani*,
   2023 WL 2811621 (S.D.N.Y. Apr. 6, 2023)..................................................... 16

*In re Application of Patokh Chodiev*,
   2021 WL 3270042 (S.D.N.Y. July 30, 2021) ................................................... 20

*In re Application of Sauren Fonds-Select SICAV*,
  No. 2:16-CV-00133, 2016 WL 6304438 (D.N.J. Oct. 26, 2016) ................................... 17

*In re Application of Sveaas*,
  249 F.R.D. 96 (S.D.N.Y. 2008) ..................................................................................... 16

*In re Aso*,
  No. 19MC190, 2019 WL 3244151 (S.D.N.Y. July 19, 2019)........................................ 17

*In re Bayerische Motoren Werke AG*,
  2022 WL 2817215 (S.D.N.Y. July 19, 2022) ................................................................ 23

*In re Clerici*,
  481 F.3d 1324 (11th Cir. 2007) ..................................................................................... 19

*In re del Valle Ruiz*,
  939 F.3d 520 (2d Cir. 2019)........................................................................................... 14

*In re Emergency Ex Parte Application of Godfrey*,
  2018 WL 1863749 (S.D. Fla. Feb. 22, 2018) ................................................................ 20

*In re England/Bahamas*,
  2021 WL 3270074 (S.D. Fla. July 30, 2021)................................................................. 19

*In re Ex Parte Application of Porsche Automobil Holding SE*,
  No. 15-mc-417, 2016 WL 702327 (S.D.N.Y. Feb. 18, 2016) .................................. 1, 20

*In re Hansainvest Hanseatische Inv.-GmbH*,
  364 F. Supp. 3d 243 (S.D.N.Y. 2018)................................................................. 16, 20, 21

*In re Iraq Telecom Ltd.*,
  2019 WL 3798059 (S.D.N.Y. Aug. 13, 2019)............................................................... 21

*In re Kuwait Ports Auth.*,
  2021 WL 5909999 (S.D.N.Y. Dec. 13, 2021) ............................................................... 16

*In re Servicio Pan Americano de Proteccion*,
  354 F. Supp. 2d 269 (S.D.N.Y. 2004)............................................................................ 19

*In re Tiberius Grp. AG*,
  2020 WL 1140784 (S.D.N.Y. Mar. 6, 2020) ................................................................. 22

*In re Veiga*,
  746 F. Supp. 2d 8 (D.D.C. 2010) ................................................................................... 16

*In re WinNet R CJSC*,
  No. 16MC484, 2017 WL 1373918 (S.D.N.Y. Apr. 13, 2017) ....................................... 18

iv

*In re Zouzar Bouka; Vision Indian Ocean S.A.*,
    2022 WL 15527657, (S.D.N.Y. Oct. 28, 2022) ............................................................ 16

*Intel Corp. v. Advanced Micro Devices, Inc.*,
    542 U.S. 241 (2004) .............................................................................. 15, 17, 18, 22

*Kang v. Nova Vision, Inc.*,
    2007 WL 1879158 (S.D. Fla. June 26, 2007) ............................................................ 21

*Marubeni Am. Corp. v. LBA Y.K.*,
    335 F. App'x 95 (2d Cir. 2009) ....................................................................... 18

*Matter of Makhpal Karibzhanova for Jud. Assistance Pursuant to 28 U.S.C. § 1782*,
    2021 WL 2435453 (S.D.N.Y. June 15, 2021) ............................................................ 23

*Mees v. Buiter*,
    793 F.3d 291 (2d Cir. 2015).......................................................................... 16

*Schottenstein et al. v. Capla et al.*,
    No. 22-10883-PKC (S.D.N.Y.) ........................................................................ 6

**Statutes**

28 U.S.C. § 1782 ............................................................................... 1, 14, 15

Orthogen International GmbH ("Orthogen" or "Petitioner") submits this memorandum of law, along with the declarations of Dr. Stefan Kruger ("Kruger Decl.") and Christopher B. Harwood ("Harwood Decl."), in support of its *ex parte* application for an order, under 28 U.S.C. § 1782 ("Section 1782"), to conduct discovery for use in a foreign proceeding (the "Petition").[1]

## PRELIMINARY STATEMENT

Orthogen, a German biotech company that licenses its propriety medical treatments to physicians around the world, seeks discovery pursuant to Section 1782 for use in a civil proceeding that Orthogen plans to file in Germany based on the underpayment of royalties it was due from two of its licensees, Mr. Edward Capla and Dr. Douglas Schottenstein ("Contemplated German Proceeding"). Specifically, pursuant to several license agreements that Orthogen entered with Mr. Capla and Dr. Schottenstein, Mr. Capla and Dr. Schottenstein were permitted to treat patients with Orthogen's patented Regenokine Program in exchange for their agreement to make royalty payments to Orthogen.

During Orthogen's multi-year relationship with Mr. Capla and Dr. Schottenstein, it received regular reports from Mr. Capla identifying, among other things, (i) the number of Regenokine Program treatments that were administered to patients through Dr. Schottenstein's practice, Schottenstein Pain and Neuro, PLLC d/b/a NY Spine ("NY Spine"), and (ii) the dollar amount invoiced pursuant to such treatments — together with affidavits attesting to the accuracy

---

[1] Section 1782 applications routinely are granted on an *ex parte* basis, including by courts in this District. *See, e.g.*, *Gushlak v. Gushlak*, 486 F. App'x 215, 217 (2d Cir. 2012) ("[I]t is neither uncommon nor improper for district courts to grant applications made pursuant to § 1782 *ex parte*."). Any issues concerning the propriety of the discovery sought, including whether it meets the requirements of Section 1782, can be addressed in a motion to quash, or in response to a motion to compel. *See id.* ("The respondent . . . can later challenge any discovery request by moving to quash pursuant to Federal Rule of Civil Procedure 45(c)(3)."); *In re Ex Parte Application of Porsche Automobil Holding SE*, No. 15-mc-417, 2016 WL 702327, at *1 n.3 (S.D.N.Y. Feb. 18, 2016) (*ex parte* consideration of Section 1782 application "is appropriate because all questions with respect to the propriety of the grant of leave and with respect to the content [of] the subpoenas are available to every subpoenaed party via a motion to quash or the defense of an application to compel"). Accordingly, no prejudice will result if Petitioner's Section 1782 application is granted *ex parte*.

of the reports.  In accordance with the terms of the license agreements, Mr. Capla was required to report such information to Orthogen, and Orthogen was to use, and did use, the figures reported by Mr. Capla to invoice Mr. Capla and Dr. Schottenstein for the use of its Regenokine Program. Based on the reports from Mr. Capla, Orthogen invoiced and was paid a total of $6.3 million.

Throughout its relationship with Mr. Capla and Dr. Schottenstein, Orthogen believed that Mr. Capla's reports were accurate, and that it therefore was invoicing and being paid the amounts it was due under the license agreements.  Recently, however, Orthogen has obtained evidence reflecting that it was systematically defrauded through the underreporting of patient treatments and the withholding of millions of dollars in royalty payments to which it was due.

Orthogen learned of the fraud when, in connection with a lawsuit that Dr. Schottenstein recently filed against it and Mr. Capla (among others) in the U.S. District Court for the Southern District of New York ("SDNY Action") arising out of the termination of Dr. Schottenstein's license agreement with Orthogen, Dr. Schottenstein made sworn statements indicating that the number of Rogenokine patient treatments administered by NY Spine was far higher than Mr. Capla had reported.  Specifically, in his verified complaint in the SDNY Action, Dr. Schottenstein stated that NY Spine treated thousands more patients than was reported to Orthogen and that he and Mr. Capla received millions of dollars more than would have been appropriate if the number of patient treatments reported to Orthogen was accurate.

Based on Dr. Schottenstein's statements in the SDNY Action, for years Mr. Capla apparently (i) prepared false reports that vastly understated both the number of Regenokine patient treatments provided by NY Spine and the dollar amounts invoiced in connection with such treatments, and (ii) falsely attested to the reports' accuracy.  Moreover, although Dr. Schottenstein did not prepare the reports, good reason exists to believe that Dr. Schottenstein

2

knew about the apparent misconduct.  Beginning in 2013, the bank wires that Orthogen received

in response to its invoices came from "Schottenstein Pain and Neuro" — *i.e.,* Dr. Schottenstein's

practice.  Dr. Schottenstein presumably (i) knew the amounts that *his practice* was remitting to

Orthogen as payment for the royalties due under the license agreements, and (ii) recognized that

such amounts could not be squared with the number of patients that *his practice* treated.

Accordingly, Orthogen intends to initiate a lawsuit against Mr. Capla and Dr.

Schottenstein in Germany (an indisputably proper venue for such a lawsuit under the terms of the

license agreements), in which it plans to assert claims for breach of contract and fraud.  To

further develop the facts for purposes of the Contemplated German Proceeding, Orthogen seeks

discovery through this Petition from Dr. Schottenstein and his practice, NY Spine, that is highly

relevant to its anticipated claims.  The discovery seeks information related to the number of

Regenokine Program patient treatments provided by NY Spine, the amounts that patients paid for

such treatments, the amounts that Dr. Schottenstein and Mr. Capla received in connection with

the treatments, and the statements concerning each of the foregoing matters that Dr.

Schottenstein made in his public filings in the SDNY Action.[2]

For the reasons set forth below, Orthogen respectfully submits that this Section 1782

Petition should be granted.  *First*, the Petition meets the statutory requirements for a Section

1782 petition because: (i) Dr. Schottenstein and NY Spine "reside" and/or are "found" in this

District; (ii) the discovery sought is "for use" in a "foreign proceeding" that is reasonably

contemplated; and (iii) Orthogen would be a party to (and thus an "interested person" in) the

foreign proceeding.

---

[2] Orthogen is filing a similar Section 1782 petition in Florida directed at Mr. Capla and his wife, Yolanda Capla, who worked at NY Spine and transmitted many of the reports prepared by Mr. Capla to Orthogen.

*Second*, the discretionary factors that courts consider in determining whether to authorize discovery pursuant to Section 1782 all favor granting the Petition. Specifically, (i) the discovery sought from Dr. Schottenstein and NY Spine would be unavailable in the Contemplated German Proceeding, which counsels in favor of granting the Petition (as other courts considering Section 1782 applications in connection with German proceedings have found); (ii) no reason exists to believe that a German court would be unreceptive to the requested discovery; (iii) the Section 1782 Petition is not an attempt to circumvent any proof-gathering restrictions of the German courts; and (iv) the requested discovery is not unduly intrusive or burdensome.

## BACKGROUND

### A. Mr. Capla Apparently Underreported Regenokine Treatments to Orthogen

Orthogen is a privately held, research-based biotech company that has developed various patented medical technologies. Kruger Decl. ¶ 2. One such patented technology is the Regenokine Program, a regenerative medicinal therapy used to treat a patient's joint and muscle pain. *Id.* ¶ 3. To facilitate Regenokine Program patient treatments in the United States, Orthogen contracted with Mr. Capla and Dr. Schottenstein. *Id.* ¶ 4.

Orthogen entered into one license agreement with Mr. Capla alone and three agreements with both Mr. Capla and Dr. Schottenstein. *Id.* ¶ 5. Specifically, in May 2011, Orthogen entered into an initial license agreement with Mr. Capla alone, whereas in October 2012, September 2013, and June 2014, Orthogen entered into subsequent license agreements with both Mr. Capla and Dr. Schottenstein (each individually, an "Agreement," and collectively, the "Agreements"). *Id.* ¶ 6; *see also id.* ¶ 7 (attaching copies of the agreements). The Agreements permitted Mr. Capla and Dr. Schottenstein to use the Regenokine Program in exchange for their agreement to make specified royalty payments to Orthogen. *Id.* ¶ 8.

4

Under the 2011, 2012, and 2013 Agreements, Orthogen was to be paid 40% of the net fees (*i.e.*, the gross fees after the deduction of certain costs and taxes) obtained through the use of the Regenokine Program. *Id.* ¶ 9. Under the 2014 Agreement, Orthogen was to be paid a set dollar amount for each treatment provided to a patient using the Regenokine Program.[3] *Id.* ¶ 10.

Under all four Agreements, Orthogen was to be provided regular reports setting forth, among other things, each Regenokine Program treatment administered to a patient within the reporting period, and the amount of money invoiced for each such treatment. *Id.* ¶ 11. The reports were to be accompanied by an affidavit attesting to the accuracy of the information in the reports.[4] *Id.* ¶ 12. Both Mr. Capla and Dr. Schottenstein were responsible for providing the reports and affidavits under the 2012 Agreement; under the other Agreements, the responsibility was Mr. Capla's alone. *Id.* ¶ 13. In practice, under all four Agreements, Mr. Capla was the one responsible for the reports and affidavits. *Id.* Indeed, for all four Agreements, he signed both the reports and the affidavits that were provided to Orthogen. *Id.* Under the 2012, 2013, and 2014 Agreements, Mr. Capla and Dr. Schottenstein agreed that "[f]or any and all payments that are due under or in connection with th[e] Agreement[s], . . . [they would] be considered joint debtors." *Id.* ¶ 15.

All four Agreements provide that German law governs any disputes arising under them. *Id.* ¶ 16. With respect to forum selection, the 2011 and 2012 Agreements provide that German

---

[3] The payment schedule was: (i) $4,000 for any treatment of a joint, muscle, or tendon in a patient (unless the patient already had received treatment of a joint, muscle, or tendon within the prior six months, in which case the cost per treatment was $2,000), and (ii) $5,000 per treatment of the spine in a patient. Kruger Decl. ¶ 10.

[4] Under the 2011 and 2012 Agreements, the submissions were to be "affidavits," whereas under the 2013 and 2014 Agreements, the submissions were to be "written confirmations." Kruger Decl. ¶ 12. Both the affidavits and confirmations are referred to herein as "affidavits." Whether the submissions were by "affidavit" or "written confirmation" is immaterial for the purposes of the claims Orthogen plans to advance in the Contemplated German Proceeding. *Id.*

courts have exclusive jurisdiction over any disputes, but include an exception allowing Orthogen

to initiate litigation in New York.  *Id.*  The 2013 and 2014 Agreements also provide that German

courts have exclusive jurisdiction over any disputes, and do not include any exception.  *Id.*

During the period when the Agreements were in effect — August 2011 through May

2020 — Mr. Capla executed the required reports and affidavits that were provided to Orthogen,

attesting that a total of 1,325 Regenokine Program patient treatments were administered.  *Id.* ¶

18.  Based on those reports and affidavits, Orthogen invoiced and was paid a total of $6,303,300.

*Id.* ¶ 19.  In December 2022, however, Orthogen obtained information — specifically, sworn

evidence that Dr. Schottenstein submitted in the SDNY Action, *Schottenstein et al. v. Capla et

al.*, No. 22-10883-PKC (S.D.N.Y.) — that led it to conclude that the reports and affidavits

prepared by Mr. Capla were false, in that they substantially underreported (i) the number of

patient treatments that were provided and (ii) the associated fees that were invoiced.  *Id.* ¶ 20.

**B.    As a Result of the Apparently False Reports and Affidavits, Orthogen
       Appears to Have Been Defrauded Out of Many Millions of Dollars**

On December 27, 2022, Dr. Schottenstein and his practice, NY Spine, filed the complaint

in the SDNY Action against, among others, Orthogen and Mr. Capla.  Harwood Decl. ¶ 2.  The

claims against Orthogen are meritless, and indeed, since filing the complaint, Dr. Schottenstein

has not pursued it or even validly served it.[5]  *Id.* ¶¶ 3-4.  The complaint, however (which was

verified under oath by Dr. Schottenstein), as well as an accompanying affidavit submitted by Dr.

---

[5]  In response to the complaint and a proposed order to show cause seeking injunctive relief filed by Dr.
Schottenstein in the SDNY Action, the court in the SDNY Action issued an order on December 28, 2022, in which it
stated that it was "declin[ing] to issue the proposed Order to Show Cause because a review of the Complaint
demonstrates, at least preliminarily, that the Court lacks subject matter jurisdiction."  Harwood Decl. ¶ 3.  In
response, on December 30, 2022, Dr. Schottenstein's attorneys stated in a letter to the court that they were
withdrawing the application for injunctive relief and that they would be filing an amended complaint by January 13,
2023 — which they suggested would cure the "issues as to subject matter jurisdiction" — but they have since not
filed any amended complaint or further pursued the initial complaint.  *Id.*

Schottenstein, contain statements that revealed to Orthogen that, for years, Orthogen was defrauded out of millions of dollars.  *See id.* Exs. A & B.

In particular, Dr. Schottenstein's complaint and affidavit attest that: (i) "[t]ens of millions of dollars of revenue" were paid to Orthogen (*id.* Ex. B ¶ 20); (ii) from 2014 through 2020, the Regenokine Program "yielded distributions to plaintiffs [*i.e.*, Dr. Schottenstein and NY Spine] of $6 million per year and a like amount to [Mr.] Capla with distributions to J. Capla, T. Capla and Y. Capla [relatives of Mr. Capla] for their services" (*id.* Ex. A ¶¶ 51, 76); and (iii) after 2014, the number of Regenokine Program patients treated "through … NY Spine … grew to in excess of 3,500" (*id.*).

The above statements support that Mr. Capla's reports and affidavits were false, and, as a result, Orthogen was significantly underpaid.  Kruger Decl. ¶ 22.  *First*, as set forth above, based on Mr. Capla's reports and affidavits, Orthogen billed and was paid a total of $6.3 million pursuant to the Agreements.  If, however, "[t]ens of millions of dollars of revenue" should have been paid to Orthogen (as Dr. Schottenstein's affidavit states), then the reports and affidavits significantly underreported the number of the Regenokine Program treatments administered to patients and the fees invoiced for such treatments.  *Id.* ¶ 23.

*Second*, Dr. Schottenstein's statement that he and Mr. Capla each received "distributions . . . of $6 million *per year*" cannot be squared with the reports and affidavits that were submitted to Orthogen over a period spanning nearly *nine years* — pursuant to which Orthogen was paid a total of only $6.3 million.  Based on how Orthogen was to be compensated, Mr. Capla's and Dr. Schottenstein's stated receipt of $6 million per year means that Orthogen should have received more than $6 million per year.  *Id.* ¶ 24.

*Finally*, Dr. Schottenstein's sworn statement that there were "in excess of 3,500"

Regenokine *patients* stands in stark contrast to the 1,325 total patient *treatments* reported by Mr. Capla.  Again, based on how Orthogen was to be compensated, the servicing of more than 3,500 patients would mean that Orthogen should have received millions more than it was paid based on Mr. Capla's apparently false reports and affidavits.  *Id.* ¶ 25.

C.   **Evidence From the SDNY Action Strongly Supports the Conclusion that Orthogen was Underpaid by Many Millions of Dollars**

The analyses set forth below, which are based on the statements by Dr. Schottenstein in the SDNY Action, all have led Orthogen to the same well-supported conclusion:  Mr. Capla's reports and affidavits (i) were false, (ii) substantially underreported the number of treatments that were provided and the associated fees that were invoiced, and (iii) resulted in Orthogen being substantially underpaid.  *Id.* ¶ 26.

*i.   NY Spine's Apparent Servicing of 3,500 Patients*

The gap between the "in excess of 3,500" *patients* that Dr. Schottenstein's complaint states that NY Spine treated and the 1,325 total patient *treatments* that Mr. Capla reported to Orthogen evidences a substantial underpayment of royalties to Orthogen.  The underpayment exists whether the amounts owed are analyzed under the percentage approach in the 2011, 2012, and 2013 Agreements or the flat-fee approach in the 2014 Agreement.  *Id.* ¶ 27.

Under the percentage approach, Orthogen was to receive 40% of net fees collected by Mr. Capla and Dr. Schottenstein.  Mr. Capla's reports to Orthogen reflect that the average amount of fees per patient was over $12,100.  *Id.* ¶ 28.  Using the average per-patient fee amount from Mr. Capla's reports, Orthogen was entitled to receive more than $4,840 per patient (40% of $12,100 is $4,840).  *Id.*  Assuming that 3,500 patients were treated through May 2020 (Dr. Schottenstein's complaint in the SDNY Action states the true figure is "in excess of 3,500"), and using a per-patient fee amount of $4,840, Orthogen should have received more than $16.94

million in royalty payments under the percentage approach.  Because Orthogen received only $6.3 million, under this analysis, it was defrauded out of more than **$10.64 million**.  *Id.*

Alternatively, applying the flat-fee approach — under which Orthogen was to receive a flat fee of either $4,000 or $5,000 for each initial treatment of a patient — and assuming, conservatively, that (i) each of the 3,500 patients received only one treatment, and (ii) the one treatment cost the lower $4,000 amount, Orthogen should have received at least $14 million in royalty payments.  *Id.* ¶ 29.  Because Orthogen received only $6.3 million, under this analysis, it was defrauded out of at least **$7.7 million**.  *Id.*

>           ii.     *Mr. Capla and Dr. Schottenstein's Alleged Receipt of $12 Million Per Year*

Another method of analysis supported by Dr. Schottenstein's verified complaint involves analyzing the amount distributed to Mr. Capla and Dr. Schottenstein each year as a result of the Regenokine treatments:  an average (according to Dr. Schottenstein's complaint in the SDNY Action) of $12 million.  Extrapolating that figure over the eight years in which Orthogen contracted with both Mr. Capla and Dr. Schottenstein yields a total of $96 million distributed to the two of them.  *Id.* ¶ 30.  Using the 40% of fees to which Orthogen was entitled under the 2011, 2012, and 2013 Agreements as a proxy, Orthogen was entitled to $38.4 million of the $96 million (40% of $96 million is $38.4 million).  *Id.*  Because Orthogen received only $6.3 million, under this analysis, the royalty payment shortfall is **$32.1 million**.[6]  *Id.*

>   **D.     Orthogen Sent Demand Letters to Mr. Capla and Dr. Schottenstein**

Although the foregoing figures represent estimates that Orthogen has calculated based on

---

[6] Alternatively, if the $96 million represents Mr. Capla's and Dr. Schottenstein's proper share of the total fees collected (*i.e.,* 60%), that would mean that a total of $160 million in fees were collected from Regenokine patients, of which $64 million (*i.e.,* 40%) should have been paid to Orthogen.  Kruger Decl. ¶ 31.  Under this analysis, the royalty payment shortfall is approximately **$57.7 million**.  *Id.*

incomplete information, Dr. Schottenstein's statements in the SDNY Action indicate that

Orthogen was defrauded out of many millions of dollars. *Id.* ¶ 32. As a result, on March 10,

2023, shortly after Dr. Schottenstein made the statements, Orthogen sent demand letters to Mr.

Capla and Dr. Schottenstein. Harwood Decl. ¶ 5 & Exs. E & F. Each letter included the facts

and conclusions set forth above and demanded a response by March 17, 2023. *Id.*

      To date, Mr. Capla has not responded to his letter, which is telling. *Id.* ¶ 6. Dr.

Schottenstein, by contrast, responded to his letter through his attorney, Jeffrey Donner, Esq. *Id.*

¶ 7. During a telephone call on March 22, 2023, Mr. Donner stated, in substance, that (i) the

representation in Dr. Schottenstein's complaint in the SDNY Action that he and Mr. Capla each

received an average of $6 million per year is incorrect, and the correct number is $3 million

(though he also suggested that the figure was less in earlier years), (ii) the representation that

3,500 patients were treated with the Regenokine program likely is correct, and certainly over

2,000 patients were treated, and (iii) Dr. Schottenstein was not involved in the preparation or

submission of the reports and affidavits, was assured by Mr. Capla that the reporting to Orthogen

was accurate, and is unaware of any underpayment of royalties to Orthogen. *Id.* ¶ 8.

      Even if Mr. Donner's above statements were accurate — which would mean that Dr.

Schottenstein made false statements in his verified complaint — the statements confirm that

Orthogen was substantially underpaid and that discovery from Dr. Schottenstein and NY Spine

relating to the underpayments is warranted. Indeed, even if only 2,000 patients were treated (as

compared to the 1,325 total number of patient *treatments* reported to Orthogen), the royalty

payment shortfall would still be in the millions of dollars under the above analyses.

    **E.**    **Orthogen Seeks Discovery for the Contemplated German Proceeding**

      As set forth above, Dr. Schottenstein's statements in the SDNY Action constitute

compelling evidence that Orthogen was defrauded out of a substantial amount of money due to Mr. Capla's apparently false reports and affidavits.  Moreover, good reason exists to believe that Dr. Schottenstein knew about and facilitated the apparent misconduct.  Beginning in 2013, the bank wires that Orthogen received in response to its invoices came from "Schottenstein Pain and Neuro" — Dr. Schottenstein's practice.  Kruger Decl. ¶ 33.  Dr. Schottenstein presumably (i) knew the amounts that *his practice* was remitting to Orthogen as payment for the fees due under the license Agreements, and (ii) recognized that the amounts could not possibly be squared with the number of patients that Dr. Schottenstein has admitted *his practice* treated.  *Id.* ¶ 34.

Accordingly, Orthogen intends to file suit in Germany (a proper forum under the license Agreements) against Mr. Capla and Dr. Schottenstein — asserting claims of breach of contract and fraud — and Orthogen's German counsel has begun drafting the appropriate pleadings.  *Id.* ¶ 35.  Mr. Capla's apparent conduct in misrepresenting the number of patient treatments under the Regenokine Program and the amounts invoiced in connection with such treatments — which caused Orthogen to invoice and be paid substantially less than it was entitled to receive — fit squarely within the causes of action for breach of contract and fraud under German law.  *Id.* ¶¶ 37-39.  Moreover, Dr. Schottenstein's apparent knowledge and facilitation of the underreporting to Orthogen also exposes him to liability for fraud, and, at a minimum, his contractual agreement to be a joint debtor with Mr. Capla for any amounts due to Orthogen under the 2012, 2013 and 2014 Agreements exposes him to liability for breach of contract.  *Id.* ¶ 40.

In order to more fully develop the facts relevant to Orthogen's claims — which at this point are based on Dr. Schottenstein's representations in the SDNY Action and the referenced statements by his attorney (during which the attorney sought to revise or qualify some of those representations, albeit in ways that still reflect that Mr. Capla's reports and affidavits were false

11

and that Orthogen was substantially underpaid) — Orthogen seeks discovery from Dr. Schottenstein and his practice, NY Spine, through this Petition. *Id.* ¶ 41.

Dr. Schottenstein and his practice undoubtedly possess highly relevant evidence to the claims that Orthogen intends to assert in the Contemplated German Proceeding, including evidence regarding, among other things, the number of Regenokine Program patient treatments provided during the relevant period, the amounts patients paid for such treatments, the amounts that Dr. Schottenstein and Mr. Capla received in connection with such treatments, and the statements relating to each of the foregoing matters that Dr. Schottenstein made in his filings in the SDNY Action. *Id.* ¶ 42.  Orthogen has narrowly crafted proposed subpoenas to be served on Dr. Schottenstein and NY Spine to obtain the foregoing information, copies of which are annexed hereto as Exhibit B.  Orthogen intends to use the discovery (i) to refine its allegations in the Contemplated German Proceeding, (ii) as evidence in the Proceeding, and (iii) ultimately to prove its case in the Proceeding. *Id.* ¶ 43.

Importantly, Orthogen would be unable to obtain the discovery it seeks through this Petition in the Contemplated German Proceeding. *Id.* ¶ 44.  Under the rules governing German civil actions, Orthogen would be unable to compel Dr. Schottenstein to sit for a deposition or to compel him or his practice to produce relevant documents in their possession. *Id.* ¶ 45.  Instead, after Orthogen pleads its claims, Dr. Schottenstein would be obligated to submit a responsive pleading. *Id.* ¶ 46.  If he were to do so, the case would likely proceed to a hearing before the court, during which (unless Dr. Schottenstein were voluntarily to produce evidence relevant to Orthogen's claims) Orthogen's proof would be limited to the information it has been able to develop independently (*i.e.*, Dr. Schottenstein's statements in the SDNY Action), and following which the court would render its decision. *Id.*  Because Dr. Schottenstein's statements in the

SDNY Action do not conclusively establish the extent of (i) the apparent fraud or (ii) the associated underpayments to Orthogen, under this scenario, the court may not award Orthogen the full amount to which it is entitled.  *Id.*  If Dr. Schottenstein were to decline to submit a responsive pleading (or were to submit a responsive pleading but decline to produce evidence relevant to Orthogen's claims), the court could enter judgment in Orthogen's favor, but here too, because Dr. Schottenstein's statements in the SDNY Action do not conclusively establish the extent of the apparent misconduct or the harm to Orthogen, the court may not award Orthogen the full amount to which it is due.  *Id.* ¶¶ 47-49.  In a worst-case situation (under either of the above scenarios), the court could decline to enter a judgment for Orthogen altogether.  *Id.* ¶ 50. The discovery sought through this Petition therefore is necessary to provide Orthogen with the information it needs to fully pursue its claims.  *Id.*

Although the discovery sought through this Petition would be unavailable to Orthogen under German law, German civil courts historically have been receptive to discovery obtained through the Section 1782 process.  *See infra* Part II.  Moreover, Orthogen's German counsel has no reason to believe that a German civil court would reject or otherwise decline to consider the evidence obtained through this Petition.  *Id.* ¶ 51.

## ARGUMENT

The Court should grant Orthogen's Section 1782 Petition because (i) it meets the statutory requirements of Section 1782, *infra* Part I, and (ii) all the factors to be weighed by the Court in exercising its discretion under Section 1782 favor granting the Petition, *infra* Part II. Moreover, as discussed previously, *supra* n.1, Dr. Schottenstein and NY Spine can challenge the subpoenas once they are served, and therefore will not be prejudiced by the granting of the Petition *ex parte*.

I.     **THE PETITION SATISFIES THE STATUTORY REQUIREMENTS OF SECTION 1782**

To obtain discovery under Section 1782, an applicant must show that (i) the person from whom discovery is sought "resides or is found in" the district where the application is brought; (ii) the discovery sought is for "use" in a foreign proceeding before a foreign or international tribunal; and (iii) the application is made by a foreign or international tribunal or an "interested person."  *See, e.g., In re Accent Delight Int'l Ltd.*, 869 F.3d 121, 128 (2d Cir. 2017); *Certain Funds, Accounts &/or Inv. Vehicles v. KPMG, L.L.P.*, 798 F.3d 113, 117 (2d Cir. 2015). Orthogen's application meets each of these requirements.

A.     **Dr. Schottenstein and NY Spine Reside and/or Are Found in this District**

Orthogen satisfies the first statutory requirement because this Court has personal jurisdiction over Dr. Schottenstein and NY Spine.  A court's authority to compel discovery under Section 1782 extends to any "person" who "resides or is found in" the district over which the court presides.  28 U.S.C. § 1782(a).  A person or entity "resides or is found in" this District if this Court can exercise personal jurisdiction over the person or entity.  *See In re del Valle Ruiz*, 939 F.3d 520, 528 (2d Cir. 2019) ("resides or is found in" standard "extends to the limits of personal jurisdiction consistent with due process").

Here, this Court has personal jurisdiction over Dr. Schottenstein because he practices medicine in this District, provided Regenokine Program treatments in this District, and he maintains his primary residence and domicile in this District (in an apartment building on 9th Avenue).  Harwood Decl. ¶ 5.  *See Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011) ("For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile."); *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475–76 (1985)

14

(personal jurisdiction exists "where the defendant deliberately has engaged in significant activities within a State, or has created continuing obligations between himself and residents of the forum").  Similarly, this court has personal jurisdiction over NY Spine because the practice maintains its principal office within this District (at 18 East 48th Street, New York, NY 10017).  Harwood Decl. ¶ 5.  *See Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014) (general jurisdiction over an entity exists in the location where the entity has its principal place of business).

### B.    The Discovery Sought Is for Use in a Proceeding Before a Foreign Tribunal

Orthogen satisfies the second statutory requirement, because it is seeking the requested discovery for "use in a proceeding in a foreign . . . tribunal."  28 U.S.C. § 1782.  The Supreme Court has made clear that the proceeding need not be pending or even imminent; it merely needs to "be within reasonable contemplation."  *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 259 (2004).  To be within reasonable contemplation, "the applicant must have more than a subjective intent to undertake some legal action, and instead must provide some objective indicium that the action is being contemplated."  *Certain Funds,* 798 F.3d at 123.

Here, this Petition provides ample objective indicia that a foreign proceeding is in fact being contemplated.  Orthogen has retained German counsel who, through his declaration, has (i) demonstrated that Orthogen has an evidentiary basis to allege that it was defrauded by Mr. Capla and Dr. Schottenstein, (ii) explained that the existing evidence (*i.e.*, the statements by Dr. Schottenstein in the SDNY Action) would support claims for breach of contract and fraud under German law, and (iii) established that Orthogen has begun taking steps to bring suit in court in Germany against Mr. Capla and Dr. Schottenstein, including drafting the necessary pleadings.  Kruger Decl. ¶¶ 20-40.  Where, as here, the applicant has "retained [local] counsel," has "said counsel has begun preparing the necessary pleadings for the petition," "has provided declarations

15

expressing intent to initiate" the foreign proceeding, and has "set forth a theory of liability,"
courts find sufficient objective indicia that the foreign proceeding is within reasonable
contemplation. *In re Kuwait Ports Auth.*, 2021 WL 5909999, at *8 (S.D.N.Y. Dec. 13, 2021);
*see, e.g.*, *In re Zouzar Bouka; Vision Indian Ocean S.A.*, 2022 WL 15527657, at *8 (S.D.N.Y.
Oct. 28, 2022) (reasonable contemplation found where applicant "retained local counsel, laid out
a basis for liability, and identified the factual basis of his claims"). That Orthogen sent "a
detailed demand letter" provides further support that the foreign proceeding is within reasonable
contemplation. *In re Hansainvest Hanseatische Inv.-GmbH*, 364 F. Supp. 3d 243, 249 (S.D.N.Y.
2018).

Moreover, Section 1782's "for use" requirement is *de minimis*. The party seeking
discovery need only show that the discovery will "be employed with some advantage . . . in the
proceeding." *Mees v. Buiter*, 793 F.3d 291, 298 (2d Cir. 2015); *In re Veiga*, 746 F. Supp. 2d 8,
18 (D.D.C. 2010) (explaining that the "burden imposed upon an applicant" by the "for use"
requirement is "de minimis," and that "district courts need not determine that the evidence would
actually, or even probably, be admissible in the foreign proceeding"); *In re Application of
Sveaas*, 249 F.R.D. 96, 107 (S.D.N.Y. 2008) (characterizing the "for use" requirement as a
"broadly permissive standard").

Here, as explained above, the discovery Orthogen is seeking is directly relevant to the
claims it plans to pursue in the Contemplated German Proceeding, and Orthogen intends to use
the discovery to its advantage in that Proceeding: to refine and plead its allegations against Mr.
Capla and Dr. Schottenstein and ultimately to prove its case. *See, e.g.*, *In re Application of
Mutabagani*, 2023 WL 2811621, at *3 (S.D.N.Y. Apr. 6, 2023) ("for use" requirement satisfied
where discovery was intended to be used to refine pleading in contemplated foreign proceeding).

16

### C.    Orthogen is an "Interested Person" for Purposes of the Foreign Proceeding

Orthogen satisfies Section 1782's final statutory requirement, because it would be the plaintiff in the Contemplated German Proceeding, and thus qualifies as an "interested person" under the statute.  *Intel*, 542 U.S. at 256 ("No doubt litigants are included among, and may be the most common example of, the 'interested person[s]' who may invoke § 1782."); *Application of Esses*, 101 F.3d 873, 875 (2d Cir. 1996) (a "party to [foreign] proceedings" is an "'interested person'").

The Petition thus satisfies all three statutory elements of Section 1782, and the Court may therefore order the requested discovery in its discretion.

## II.    THE FOUR DISCRETIONARY FACTORS ALL WEIGH IN FAVOR OF GRANTING THE REQUESTED DISCOVERY

When, as here, the Section 1782 statutory requirements are met, courts also consider four discretionary factors in deciding whether to grant discovery under Section 1782:

> (1) whether "the person from whom the discovery is sought is a participant in the foreign proceeding"; (2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance"; (3) "whether the § 1782 request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States"; and (4) whether the § 1782 application contains "unduly intrusive or burdensome" discovery requests.

*In re Aso*, No. 19MC190, 2019 WL 3244151, at *1 (S.D.N.Y. July 19, 2019) (quoting *Intel*, 542 U.S. at 264-65).  In considering these factors, courts exercise their discretion liberally in favor of granting discovery.  *See, e.g.*, *Advanced Micro Devices, Inc. v. Intel Corp.*, 292 F.3d 664, 669 (9th Cir. 2002), *aff'd*, 542 U.S. 241 (2004) ("[A]llowance of liberal discovery seems entirely consistent with the . . . aims of Section 1782."); *In re Application of Sauren Fonds-Select SICAV*, No. 2:16-CV-00133, 2016 WL 6304438, at *2 (D.N.J. Oct. 26, 2016) ("Congress

intended § 1782 to be interpreted liberally.").  Moreover, the "decision to deny a § 1782 application may not be taken lightly," and Section 1782 applications are denied based on the discretionary factors only in "unusual cases."  *In re WinNet R CJSC*, No. 16MC484, 2017 WL 1373918, at *9 (S.D.N.Y. Apr. 13, 2017).  Here, each of the discretionary factors weighs in favor of granting Orthogen's requested discovery.

   **A.**  **Orthogen Needs Section 1782 Discovery From Dr. Schottenstein and NY Spine**

   Although the Supreme Court has noted that "when the person from whom discovery is sought is a participant in the foreign proceeding . . . the need for § 1782(a) aid generally is not as apparent," *Intel*, 542 U.S. at 264, "Section 1782 aid is not foreclosed just because the need for such aid may not be as readily apparent," *In re Application of Auto-Guadeloupe Investissement S.A.*, 2012 WL 4841945, at *5 (S.D.N.Y. Oct. 10, 2012), and here, the need exists for Section 1782 discovery as to both Dr. Schottenstein (an anticipated defendant in the Contemplated German Proceeding) and his medical practice (which is not an anticipated defendant).  *See also Marubeni Am. Corp. v. LBA Y.K.*, 335 F. App'x 95, 98 (2d Cir. 2009) (upholding grant of Section 1782 application even where the district court acknowledged that discovery would be taken from a participant in the foreign proceeding and that the discovery would likely be available in the foreign proceeding).

   As an initial matter, although Orthogen has good reason to believe that Dr. Schottenstein's medical practice, NY Spine, has information relevant to its anticipated claims (given, among other things, that the Regenokine patient treatments at issue were provided through NY Spine, Harwood Decl. Ex. A ¶ 76, and payments to Orthogen under the license Agreements were made from NY Spine, Kruger Decl. ¶ 33), Orthogen does not intend to name NY Spine as a party to the Contemplated German Proceeding.  Consistent with that intention,

Orthogen sent a demand letter to Dr. Schottenstein, but not to NY Spine.  NY Spine's nonparty

status means that the first discretionary factor unquestionably supports granting the Petition as it

relates to it, particularly because NY Spine undoubtedly possess key evidence in connection with

the Contemplated German Proceeding, including records of the actual number of Regenokine

patient treatments that were provided.

    Moreover, even though Dr. Schottenstein is an anticipated party to the Contemplated

German Proceeding, courts routinely find that the first factor favors the applicant in such

circumstances when, as here, the discovery sought pursuant to Section 1782 likely would be

unavailable in the foreign proceeding.  *See, e.g., In re Servicio Pan Americano de Proteccion,*

354 F. Supp. 2d 269, 274 (S.D.N.Y. 2004) (granting application and noting that "the apparent

limitations of Venezuelan discovery rules suggest that the exercise of jurisdiction by this Court

may be necessary to provide Pan Americano with the documents it seeks"); *In re Application of*

*Auto-Guadeloupe,* 2012 WL 4841945, at *5 (first factor favored applicant where it was "not

clear the [foreign c]ourt could order [respondent] to produce the documents that [petitioner] is

seeking").[7]

    As Orthogen's German counsel explained in his declaration, Orthogen would be unable

to obtain the discovery it seeks through this petition in the Contemplated German Proceeding.

*See* Kruger Decl. ¶¶ 44-45 (explaining that in the Contemplated German Proceeding, Orthogen

would be unable to compel Dr. Schottenstein or NY Spine to sit for a deposition or produce

relevant documents).  Orthogen's German counsel also has explained that the discovery sought

through this Petition is necessary to provide Orthogen with the information it needs to fully

---

[7] *See also, e.g.*, *In re Clerici*, 481 F.3d 1324, 1335 (11th Cir. 2007) (first factor favored applicant where overseas court could not require respondent to produce the requested discovery); *In re England/Bahamas*, 2021 WL 3270074, at *6 (S.D. Fla. July 30, 2021) (first factor favored applicant because "it remain[ed] unclear whether a foreign tribunal could enforce a pre-suit discovery order against" respondent).

pursue its claims. *See id.* ¶¶ 46-50 (explaining how, absent the discovery sought here, Orthogen could be prejudiced significantly in pursuing its claims).

In situations such as this, where discovery in the foreign proceeding is limited such that the applicant would be unlikely to obtain the discovery sought through Section 1782 in the foreign proceeding, courts find that the first discretionary factor favors the applicant. *See, e.g.*, *In re Emergency Ex Parte Application of Godfrey*, 2018 WL 1863749, at *8 (S.D. Fla. Feb. 22, 2018) (citing similar disclosure limitations under English law as reason why first factor weighed in favor of discovery). As particularly relevant here, courts in this District have found that the general lack of discovery in German proceedings warrants allowing Section 1782 discovery from parties (or contemplated parties) to German proceedings. *See, e.g., In re Ex Parte Application of Porsche Automobil Holding SE*, No. 15-MC-417 (LAK), 2016 WL 702327, at *7 (S.D.N.Y. Feb. 18, 2016) (defendant in German litigation could use Section 1782 to obtain discovery from plaintiffs); *In re Hansainvest*, 364 F. Supp. 3d at 250 (citing "the limitations of German discovery" in granting 1782 petition).[8]

**B. A German Court Likely Would Be Receptive to the Requested Discovery**

In considering the second factor — the nature of the foreign tribunal and its receptivity to judicial assistance from a U.S. federal court — courts require "authoritative proof that [the] foreign tribunal would reject [the] evidence obtained with the aid of section 1782" before finding that this factor weighs against granting a Section 1782 application. *Euromepa, S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1100 (2d Cir. 1995); *see In re Iraq Telecom Ltd.*, 2019 WL

---

[8] Even where courts find that the first discretionary factor does not favor the applicant, Section 1782 applications still are granted where the other factors weigh in the applicant's favor. *See In re Application of Patokh Chodiev*, 2021 WL 3270042, at *2 (S.D.N.Y. July 30, 2021) ("Despite Refinitiv US being a party to the contemplated proceeding, . . . the Court concludes that the subpoena is warranted under the *Intel* factors.").

3798059, at *4 (S.D.N.Y. Aug. 13, 2019) ("In absence of specific evidence that the [foreign courts and arbitral forums] would reject Petitioner's requested discovery, this second factor also weighs in favor of granting the application.").

Here, as Orthogen's German counsel has confirmed, no reason exists to believe that a German court would reject the evidence obtained through this Petition. Kruger Decl. ¶ 51. To the contrary, German courts typically are receptive to discovery and evidence obtained through Section 1782, as evidenced by the fact that U.S. courts "routinely grant Section 1782 applications for proceedings in Germany." *In re Hansainvest*, 364 F. Supp. 3d at 251. Indeed, "there exists a substantial amount of case law where courts have found that German commercial courts are an appropriate forum for § 1782 assistance." *Kang v. Nova Vision, Inc.*, 2007 WL 1879158, at *2 (S.D. Fla. June 26, 2007). This factor thus weighs in favor of granting the application. *See In re Application of Johannes Roessner*, 2021 WL 5042861, at *3 (S.D.N.Y. Oct. 29, 2021) (second factor favored petition where, as here, German counsel stated that he was "not aware of any German laws or restrictions that would preclude the use of the discovery sought").

### C.     Petitioner Is Not Seeking to Circumvent German Proof-Gathering Restrictions

Courts in this District weigh the third factor against the applicant only where they find that the application was brought in bad faith. *See, e.g.*, *In re Application of Hill*, 2007 WL 1226141, at *3 (S.D.N.Y. Apr. 23, 2007) ("Absent any indication of bad faith on [the applicant's] part, the Court is 'simply unwilling to weigh the request for § 1782 assistance itself as a negative discretionary factor.'" (citation omitted)). Accordingly, "[o]nly where the materials being sought are privileged or otherwise prohibited from being discovered or used is the third *Intel* factor implicated." *In re Tiberius Grp. AG*, 2020 WL 1140784, at *4 (S.D.N.Y.

Mar. 6, 2020).  That German discovery rules are more limited than those in the United States does not affect the analysis under the third discretionary factor.  "Courts routinely grant § 1782 applications where the discovery sought might not be available in the foreign legal system, but [as here] is not explicitly prohibited from being acquired by way of a § 1782 application." *Id.* at *5.

Here, Orthogen seeks the requested discovery in good faith for use in the Contemplated German Proceeding.  As set forth above, no reason exists to believe that a German court would reject the requested discovery, Kruger Decl. ¶ 51, and Orthogen has demonstrated that the requested discovery is highly relevant to its potential claims in the Contemplated German Proceeding.  Moreover, Orthogen does not seek any privileged information in connection with this Petition, and to the extent that any of the documents or communications responsive to the requested discovery are subject to a valid claim of privilege, the subpoenas that Orthogen proposes to serve on Dr. Schottenstein and NY Spine provide for the withholding (and logging) of such documents or communications.  Accordingly, this factor weighs in favor of granting the instant Petition.

### D.    Orthogen's Discovery Requests Are Narrowly Tailored and Are Not Unduly Intrusive or Burdensome

The fourth factor also weighs in favor of authorizing the requested discovery because Orthogen's discovery requests are narrowly tailored and in no way "unduly intrusive or burdensome." *See Intel*, 542 U.S. at 265.  The subpoenas that Orthogen seeks to serve on Dr. Schottenstein and NY Spine are narrowly tailored to obtain documents and testimony about topics that are central to its anticipated claims in the Contemplated German Proceeding including:  the number of patient treatments provided under the license Agreements, the amounts paid by patients and received by Dr. Schottenstein and Mr. Capla in connection with those

treatments, and the representations about the treatments that were made to Orthogen. Accordingly, this factor weighs in favor of granting the application. *See, e.g., In re Bayerische Motoren Werke AG*, 2022 WL 2817215, at *6 (S.D.N.Y. July 19, 2022) (requests seeking documents and testimony for relevant time period not unduly burdensome); *Matter of Makhpal Karibzhanova for Jud. Assistance Pursuant to 28 U.S.C. § 1782*, 2021 WL 2435453, at *3 (S.D.N.Y. June 15, 2021) (requests not unduly burdensome where documents and deposition testimony sought were critical to preparation of the applicant's case).

Because all four discretionary factors weigh in favor of granting the Petition, Orthogen respectfully submits that the Court should grant the Petition.

## CONCLUSION

Orthogen respectfully requests that the Court endorse the Proposed Order annexed hereto as Exhibit A, which grants Orthogen leave to serve the subpoenas annexed hereto as Exhibit B.

Dated: May 4, 2023
      New York, NY

                                     MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.

                                     */s/ Christopher B. Harwood*
                                     Christopher B. Harwood
                                     Joseph Stern
                                     565 Fifth Avenue
                                     New York, New York 10017
                                     Tel: (212) 856-9600
                                     Fax: (212) 856-9494
                                     charwood@maglaw.com
                                     jstern@maglaw.com

                                     *Attorneys for Petitioner Orthogen International GmbH*